# IN THE MATTER OF PROCEEDINGS BEFORE A GRAND JURY.

No. 01-P-1813.

Suffolk. January 18, 2002. - May 30, 2002.

Present: GREENBERG, KAFKER, & COHEN, JJ.

*Grand Jury. Constitutional Law,* Self-incrimination.

In the circumstances of a proceeding before a grand jury, it was reasonable for a witness to fear that her proposed testimony might tend to incriminate her because of her proximity to a certain crime and the potential for her to be implicated as an alternative perpetrator or as a joint venturer or accessory, with the result that the assertion of her privilege against self-incrimination was proper. [20-23]

ADJUDICATION of contempt in the Superior Court Department by *Carol S. Ball,* J., on December 11, 2001.

A motion for a stay of the judgment of contempt was considered in the Appeals Court by *Cohen,* J., and was referred by her to a panel of the court.

*Jeffrey T. Richards,* Committee for Public Counsel Services (*Beth L. Eisenberg,* Committee for Public Counsel Services, with him) for the witness.

*Paul M. Treseler,* Assistant District Attorney, (*Daniel J. Hourihan,* Assistant District Attorney, with him) for the Commonwealth.

COHEN, J. A juvenile witness appeals from a judgment of the Superior Court holding her in contempt for refusing to answer questions put to her before a Suffolk County grand jury investigating charges of arson and larceny.[1] The witness claims that her refusal to answer questions at the grand jury was lawful in that she properly invoked her privilege against self-

---

[1]This matter was first brought to this court in the single justice session on the witness's motion for a stay of the judgment of contempt, pending appeal. The motion was allowed, and the appeal was expedited.

incrimination under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. We agree with the witness and reverse the judgment of contempt.

*Background.* We summarize the facts and prior proceedings based upon the somewhat limited record before us.[2] The witness is a sixteen year old high school student who worked as a part-time employee at the J. Silver Clothing Store in the Roxbury section of Boston for several months leading up to September 30, 2001. On the evening of that date, a large fire had been reported at the store. Investigation revealed that the fire was intentionally set and that a substantial sum of money had been taken from the store safe. In addition to the witness, the only other employee working in the store on that date was the assistant manager.

The police interviewed the store owners, the witness, and the assistant manager. They learned that, because of her position, the assistant manager was in authorized possession of the combination to the store safe, the keys to the store's front door and outer security gate, and a security alarm activation code that identified the person using it as "user number 2." Security company records presented to the grand jury reflected that, at 6:17 P.M. on the evening of the fire, the security code assigned to "user number 2" was used to activate the alarm. Three minutes later the same code was used again, presumably to reopen the store, and then the alarm was not reset. Fire was reported at about 6:31 P.M.

According to a police report, the witness gave investigating officers the following information. On the day in question, she and the assistant manager were the only two people on duty. Several times during the day, they switched off working the register and working the floor. At 5:00 P.M., the assistant manager locked the doors, and the witness proceeded to

---

[2]To a large extent, this matter was decided in the trial court based upon the undisputed representations of the assistant district attorney and defense counsel. We have before us the transcripts of three short hearings that were held in the Superior Court, a report of the witness's interview with the police that was called to the attention of the trial judge, and an affidavit that was submitted by defense counsel to the single justice in support of the witness's motion for a stay that encapsulates the representations made to the trial judge.

straighten up the merchandise and clean the floor. After counting the day's receipts, the assistant manager went to the back room to put the money in the safe. While there, she called the witness on the intercom to tell her that she was going to use the ladies' room. The assistant manager then emerged from the back room carrying one of her shoes in her hand. The witness remembered telling the assistant manager to slow down and stop to put her shoe on; however, the witness declined to describe the assistant manager's hurried behavior as unusual, stating only that they both were trying to catch their bus.

The assistant manager then punched in the code on the alarm panel, and both left the store. She had trouble locking the front door, so the witness did it for her. The assistant manager then closed the front grate. The witness recalled calling out, "Our bus is here," to which the assistant manager replied that she was "not going that way today, I'm taking a bus to the Red Line to meet my husband." The witness then boarded her bus and went home.

Later that night, the witness was telephoned by another individual, the store supervisor, and told that the store was on fire. When the witness next reported to work on Monday morning, store personnel yelled at her and told her she was a "suspect." The store supervisor then informed the witness that she was suspended.

The witness denied having a key to the store or knowing the alarm code or the combination to the safe. She admitted knowing of the location of the store's video camera, but she denied ever being in that room. She also told the police that she had heard the assistant manager say that the video camera did not work. The witness acknowledged having been in the back of the store on the day of the fire when she went to the ladies' room at about 3:30 P.M.

As recounted to the trial judge, the assistant manager is the target of the criminal investigation. She has been interviewed on more than one occasion, and has given three different explanations of the evening's events. At first she said that she and the witness left the store after the safe was locked up and that she had no knowledge of what happened after that. She then implied that a former employee may have perpetrated the

crimes, claiming that he had come to the store that day and made threats. Finally, after being confronted with the alarm code evidence, she stated that she may have left the safe open, that it was the witness who went back into the store to retrieve a bag, and that she (the assistant manager) had given the witness the alarm code for this purpose.

The assistant district attorney represented to the trial judge that the witness was not a target and that she would only be asked to testify to the information contained in the report of her interview with the police. Defense counsel argued to the trial judge that even if the inquiry were so limited, the witness's testimony, in the specific factual context of this case, put her at risk of self-incrimination.[3] The trial judge disagreed, finding that "[t]he witness's projected testimony is consistent both with innocence and all of the known evidence; it would not, even considered in the context of all the evidence, have a tendency to incriminate her."

On December 11, 2001, the witness appeared before the grand jury, was sworn and essentially refused to answer any questions other than her name and address. She was brought back before the court and held in contempt.

*Discussion.* "The right of a witness not to incriminate himself is secured by both the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights." *Taylor* v. *Commonwealth,* 369 Mass. 183, 187 (1975). "Under art. 12, we apply broad standards, consistent with Federal standards, in determining whether a claim of privilege is justified." *Commonwealth* v. *Martin,* 423 Mass. 496, 502 (1996). These standards are "highly protective of the constitutionally guaranteed right against self-incrimination." *Ibid.* A witness who asserts the privilege cannot be compelled "to testify unless it is *'perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to

---

[3]Because the witness contends that her invocation of the privilege is justified in light of the known content of her police statement and the over-all circumstances of the crimes, counsel for the witness did not consider it necessary to make an ex parte statement, although he was invited to do so by the judge; nor did he produce the witness for in camera examination under *Commonwealth* v. *Martin,* 423 Mass. 496, 504 (1996).

incriminate" (emphasis in original). *Ibid.*, quoting from *Commonwealth* v. *Funches*, 379 Mass. 283, 289 (1979), quoting from *Hoffman* v. *United States*, 341 U.S. 479, 488 (1951). "The privilege afforded not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute." *Ibid.*, quoting from *Commonwealth* v. *Funches*, *supra*, quoting from *Ullman* v. *United States*, 350 U.S. 422, 429 (1956).

Although there must be "a real risk that [the witness's] answers to questions will tend to indicate his involvement in illegal activity, 'and not a mere imaginary, remote or speculative possibility of prosecution,'" *Commonwealth* v. *Martin*, *supra* at 502, quoting from *In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983), "the privilege may validly be asserted whenever 'the witness has reasonable cause to apprehend danger from a direct answer.' " *In the Matter of Proceedings Before a Special Grand Jury*, 27 Mass. App. Ct. 693, 698 (1989), quoting from *Hoffman* v. *United States*, *supra* at 486. It matters not that the witness claims innocence. "To the contrary, . . . one of the Fifth Amendment's 'basic functions . . . is to protect [the] *innocent . . .* "who otherwise might be ensnared by ambiguous circumstances" ' " (emphasis in original). *Ohio* v. *Reiner*, 532 U.S. 17, 21 (2001), quoting from *Grunewald* v. *United States*, 353 U.S. 391, 421 (1957), quoting from *Slochower* v. *Board of Higher Educ. of New York City*, 350 U.S. 551, 557-558 (1956).

Applying these principles to the case at hand, we conclude that it was reasonable for the witness to fear that her proposed grand jury testimony might tend to incriminate her because of her proximity to the crime and the potential for her to be implicated as an alternative perpetrator or as a joint venturer or accessory. The witness and the assistant manager were the only two people at the store shortly before the fire was reported. By the witness's own admission, she assisted the assistant manager in closing the store in a hurried fashion. Although the fire was reported at 6:31 P.M., it is not known when it was started, who was present, or when the money was taken from the safe. The assistant manager has told the police that she gave the witness the security code to permit her to reenter the store to retrieve a

bag, and other store employees have accused the witness of involvement. Thus, it is not unreasonable for the witness to fear that she could be caught up in these ambiguous circumstances, merely by testifying consistently with her police interview.

In reaching this conclusion, we consider two cases to be particularly instructive. The first, *Ohio* v. *Reiner, supra,* is a recent per curiam decision of the United States Supreme Court. There, the defendant challenged his conviction for involuntary manslaughter in the death of his infant son because transactional immunity had been granted to a prosecution witness, a babysitter, who denied any wrongdoing. The Court held that the babysitter could assert the Fifth Amendment privilege, despite her claim of innocence, since she had reasonable cause to apprehend danger from her answers at trial. The Court emphasized that the witness was with the child within the potential time frame of the fatal trauma, and that the defense's theory of the case was that the witness, not the defendant, was responsible for the crime. "In this setting, it was reasonable for [the witness] to fear that answers to possible questions might tend to incriminate her." *Id.* at 21-22.

In a similar vein, a decision of this court has explained that placement "in close proximity not only to the allegedly illegal conduct but also to the individuals who were the targets of the investigation" may justify invocation of the privilege. *In the Matter of Proceedings Before a Special Grand Jury, supra* at 699. In that case, the pari mutuel manager at a race track was called before a special grand jury to answer questions about allegedly illegal transactions involving the cashing of winning trifecta tickets by two individuals who were targets of the investigation. These transactions had taken place on a particular date, in the witness's office, while he was on duty. Rejecting the Commonwealth's contention that the witness could not validly assert the privilege because he was not a target of the investigation and there was no suggestion of wrongdoing on his part, the court stressed that " 'the right to assert one's privilege against self-incrimination does not depend on the *likelihood,* but upon the *possibility* of prosecution' " (emphasis in original). *Id.* at 700, quoting from *In re Master Key Litigation,* 507 F.2d 292, 293 (9th Cir. 1974).

As in *Reiner*, the witness in the case before us was one of but two individuals who, because of timing and opportunity, were in a position to have perpetrated the crimes, and she has been implicated by the only other person so situated. As in *In the Matter of Proceedings Before a Special Grand Jury, supra*, the witness's testimony would place her, during the relevant time frame, at the precise location of the alleged crimes and in immediate proximity to the target of the investigation. Hence, notwithstanding her claim of innocence and the Commonwealth's representation that she is not a target, these circumstances reasonably elevate her fear of self-incrimination to more than an "imaginary, remote or speculative possibility of prosecution." *Commonwealth* v. *Martin, supra* at 502, quoting from *In re Morganroth*, 718 F.2d at 167. Accordingly, the assertion of her privilege against self-incrimination was proper.

*Judgment reversed.*

*Judgment for the witness.*